Ed Reines, on behalf of the appellate. I'd like to focus my oral argument on two issues. One is Claim 67 and the obvious misdetermination based on the Ruth and Sushaya combination. If that is overturned, that's a remand. And with respect to Claims 62 and 66, I want to focus on that even if Smith 800 is prior art, which we don't believe it is and there's a lot of legal analysis on that, that nevertheless it's not an inherent anticipation or obvious misdetermination. Starting with Claim 67, this is the four color convention, which is the idea that you can label four colors. This has been described by the district court judge himself as a major invention, and I think it's generally viewed as such in the community. The combination of Ruth and Sushaya was not presented by anybody. It was something of the district court's own adoption. Importantly, the district court totally misread Ruth. Ruth was the base reference for finding this four color concept invalid, and he stated that Ruth teaches many different spectra that you can distinguish with a computer. I don't know where that came from. Ruth is the opposite of that. Ruth doesn't mention a computer. I don't know where that just came from nowhere. And it actually, Ruth emphasizes purity. This is A148. If you look everywhere in Ruth, it talks about making a pure composition that isn't multicolor. Multicolor would be the opposite of pure. Well, doesn't something in Ruth, and I don't have the site in front of me, but I do have a quote here that specifically says it could be done with many different spectra-colors distinct from each other to be distinguishable by a computer. Right. That is Judge Posner's analysis. What actually is stated there is that you can use different reporter groups, which Ruth describes as different types of labels altogether. Fluorescence, color metric, radioactive. It's different types of labels. It's not different colors within the labels. That is an absolute fiction that has no basis whatsoever in the record. This is the risk when you have a district judge coming up with a theory that's not supported by an expert. They don't rely on their experts in their briefing or otherwise here to argue that Ruth is invalidating an obviousness. The many different spectra is not raised there. It says you can use fluorescence or radioactive or color metric. That's what Ruth says. What about the Smith 800? Does that disclose the new- I know. It's not part of the 103, but I'm just asking the disclosure in Smith 800. Smith has some different fluorescence. The emphatic position of PROMEGA expert, and I think this is the key to almost all the issues, is this Van Ness declaration, A10243247. Their position, this is a total reversal of position for the party. It was the district judge against the party. Their position is Smith plus the patent in suit, the 096, with all of that, the major DNA sequencing invention of our time. All of that is not enabled because there's blurry dyes. You can't get spectrally distinct dyes. I direct you to A10246, which is Van Ness. This is critical stuff. It says it does not appear that the 973 application disclosed an oligonucleotide that could actually be distinguishedly labeled with four different types of fluorophores as required by Claim 67. Their expert says that even all of this ground-breaking patent that's so respected in the community, that that doesn't enable four spectrally distinct fluorophores, and they want to rely on a summary of a Japanese thesis that the district judge, or Ruth, which says be pure, doesn't mention four colors, doesn't mention spectrally distinct, and somehow that's teaching you that it's obvious to do four color. That's out there. And then if you look beyond that, he said the claims are not adequately enabled. The primers are too short. You can look at A10245. The fluorescent dyes are smeary. At A10245, their expert says only two fluorophores would work for Smith. Smith could only get two color. But he's the one that's the inventor of doing this. It hasn't been found non-enabled. They lost that argument. But the point being, how can they go and say that Ruth, which is telling you to be pure, not multicolor, may render it obvious? It doesn't even enable it under their analysis. They said there's no working example of four dyes. They're talking about weaker intensity. That's at A10208. They laid it on that people skilled in the art would not know how to make four dyes, even if they were told to go do it. So how does Ruth get you to obviousness? That's claim 67. If there's any questions, or if I'm missing anything, the conventional wisdom was against using fluorescent labels. The motivation was going to come from Tushaya. Tushaya had one dye that worked. It was ethinoadenosine, and I'm sure Van Ness would have been very unhappy with that dye, too. And it speaks like, it would be great if you could make multicolor. That would be great. Okay, well, people knew that. The record also shows fluorescent labeling of nucleic acids was older than Hills. Sanger was old. Sanger was almost a decade before the patent. So it was so obvious, why weren't people doing it? Well, there are people who say Ruth himself could not DNA sequence it until 1987. Actually, I think it was 88, but he claims it was 87. That's three years after these dates, that he couldn't come up with it. How is it obvious with his own patent? Having a district judge say that there's different spectra shown, and something that just says you can use colorimetric, you can use fluorescent, that's just, with a computer, computer distinguishing it, that's just, I don't know what was happening when that was being said. So that's claim 67. I just don't see how that works. And that doesn't even take into account the incredible commercial success. I mean, this same district judge said it was in widespread use as soon as it became available. We don't even have to show commercial success. He does. Why? Because he can't deny it. I mean, it's worthy of him to acknowledge it. There's just no way. This is summary judgment against us of obviousness with no expert support. In terms of Smith 800, and I understand the question there, even if you take the stray fleeting reference of sequencing in column 3 and column 5, this is classic hindsight. I'm not one that invokes classic hindsight. Your patent attorneys do it all the time. But to say that you say sequencing and fluorescent dyes, and someone knows to make a great invention, when they say that even when people did make the invention, it didn't teach enough to allow people in the community to use it, that doesn't make any sense to me. With respect on 800, Ruth himself says the problem with modifying the nucleotides is that you have problems with the enzymatic activity in extension. He's cautioning people against the extension. There's a clear teaching away. So people coming to Smith would see that. Now, the thing about Smith is one is an inherent anticipation. I just don't know how you get to a fleeting comment that says you can do sequencing. We're now back to the other claims, claim 62. 62, 66. For claim 66, all we need to win is the argument that Smith 800 doesn't inherently anticipate or obviousness type double patenting. The written description comes in when you come to claim 62, which we should win on. I mean, I'm happy to discuss that too. But with respect to Smith 800 as a prior art reference, anticipation, inherent anticipation, to say that all these steps, none of which are reported in Smith, come in through a reference sequencing, that's the research problem. That's not the teaching. And their own witness admitted that he said you can use the Smith oligonucleotides for DNA sequencing if they have the qualities that are described in the 096 patent. Like, oh yeah, if you have the invention of the 096 patent, then you can do it. That's what their own expert said. So, I mean, if there's questions about Smith 800, inherent anticipation, I don't see how you get to inherent anticipation. It doesn't have many of the claim requirements. And to say people would go and invent the idea of these labels being used with Sanger sequencing just doesn't make sense. Well, what else would it be other than the Sanger sequence method? All of the things that were experimentally being done at the time. All the reason why... But there were only two known methods at the time. Sanger and something else. But the real world fact is if it was that simple, it would have been invented when Sanger came out in 1977. Well, the new idea was having a fluorophore tag. No, I think the opinion of this report itself says that tagging nucleic acids with fluorescence isn't new. I mean, and Ruth certainly did it, and that was before... Right, but in a Sanger sequencing method. Right, let's keep it real in the sense that Ruth had this wonderful chemistry that they talk about in early 83, and he says he couldn't make sequencing work until 87. It's not just... Revolutions don't happen so simply by saying, oh, well, we could just overthrow the government and then it happens. You've got to do it. And they're the ones that say it's virtually impossible to do. So if it's virtually impossible to do, then how do you say that it's inherently anticipated? I mean, it wouldn't even be... You might try... You would experiment. You would say sequencing and fluorescent labels, how am I going to do this? You wouldn't say, oh, I'm going to do the invention. It's the golden bell that no one else is wrong for years. And then in terms of obviousness, you then get the teaching away from Ruth. You then get the failure of others for the years, and all the secondary considerations come flooding in. So I think I'll reserve my time, but... Great. If there's any questions on either of those points, I'm happy to respond. Thank you very much. May it please the Court. I'd like to address roughly in the same order as counsel, but I think to begin with, it's important to understand what the difference is between the 800 patent and the 096 and why the claims of the 096 end up reading directly on the 800 and why they're obvious in light of the Ruth patent. And frankly, on claim 67, would be obvious in light of the 800 patent as well. And the issue comes down to, I think it's undisputed at this point, life never challenged or never tried to prove an earlier invention date than January 16 of 1984 for the 096 invention. And so... Well, I think Mr. Reines, at least in his arguments today, sort of jumped over that. So let's assume for a moment that's... So let's assume it. But, you know, what happened was at two minutes to midnight before the close of discovery was the first time they ever set forth any evidence suggesting an earlier invention date. That leaves them with the Smith 800 patent as prior art. Now, what did Smith 800 do? And I think, Judge Chen, you were right on it when you focused on what were the two methods that were available. It was Sanger sequencing and it was Maxim Gilbert. Sanger sequencing was the only method out there at the time that used oligonucleotide primers. And essentially what the Smith 800 patent did was to replace the radioactive label that was being used in Sanger sequencing with the fluorophore chemistry to use the linker arm to attach it. And then if you look at what the claims of the 096 patents are that are at issue here, 66 in the dependencies, or 62 in the dependencies, 66 and 67, they really all relate back to what was claimed and what was described in the 800. The 096 patent, and we can look at column 3 of the 800 where they put it in there, that is the cross reference, was directed to an automatic DNA sequencing machine. And so, you know, I'll go and address the claims in more detail, but if you look at 62 in the dependencies, 66 and 67, none of them have the limitation to the automatic sequencing machine for performing the actual analysis. And so when we get to this question of, you know, what's actually described, let's start with 67. All it requires are four distinguishably labeled oligonucleotides. Doesn't require them to do anything. All they have to do is be in a mixture. And this whole issue of what did Dr. Ruth do in 1987, he never testified that he couldn't do it. They're talking about an article where he describes when he did it. Okay, and his patent, his 882 patent, predates, it's prior art, to the 096. And all you have to do is look at, Ruth, at column 7 and column 8, and you can see that he identifies fluoresceins and rhodamines. Both plural, means at least two fluoresceins, at least two rhodamines. Those would be distinguishably labeled oligonucleotides when they were attached to the primer. Then one can look at Zushia, which says it would be very useful to have distinguishably labeled oligonucleotide primers for many different analysis. It doesn't matter if it's going to be used in a DNA sequencing machine, because the claim isn't limited to that. It only requires the four fluorophores. And then you find the suggestion and motivation to combine it. And under this court's precedent in DISTAR, and under KSR, we can look to the nature of the problem to be solved. And here, it's very clear to see what that would be. You've got four bases, A, G, C, T. Would be obvious to combine the chemistry of Ruth with the Sanger sequencing with the four base pairs to have four distinguishably labeled oligonucleotides, which Zushia says would be useful. What about the enablement concern? I'm sorry. Mr. Reines brings up the fact that at this moment in time, those who skill in the art in 1984 were having a really hard time with this kind of technology, including Dr. Ruth. But the enablement goes to the issue of what's in the claim. And all that's in the claim is to make four distinguishably labeled oligonucleotides with the fluorophores. That's literally what's described in the 800 and literally what's described in the 882. It doesn't say you have to use them with anything. I guess we're talking more about claims 62 and 66. Okay, so let me go to 62 and 66. But before you leave the obviousness question, can I just raise a question Mr. Reines raised? And I don't remember at the moment what, if anything, Judge Posner had to say about secondary considerations. So could you just address briefly that point? Absolutely. Judge Posner struck some of their evidence from their expert on secondary considerations. He did address it. But basically what Judge Posner found was that there was no nexus established between the secondary considerations and the claim itself. And so once again, this is directed broadly to the idea of the DNA sequencing machine, which is the subject of the 096 disclosure, not to four fluorophores. And they had no evidence that would tie commercial success, praise, or anything to putting four distinguishably labeled fluorophores in a mixture. Okay, I'm sorry. I wanted to address Judge Chet's question. Excuse me, I'm sorry. Sure. And so let me just talk, go back to what I said initially about the differences between the two exposures. The Smith 800 is directed to that linker arm chemistry. The 096 is directed to the automatic DNA sequencing machine. And if I could, just read claim 62, and this gets to the enablement question. 62 requires, and this was a limitation, a method of nucleic acid sequence analysis comprising, and then it describes basically nothing more than Sanger sequencing where the radioactive label has been replaced with a fluorophore. There's nothing in here about single-lane sequencing. There's nothing in here about using a machine to automatically detect. So why does that matter for the enablement argument? Well, if we think about Sanger sequencing, what was that? That was classic four-lane sequencing. You could use a radioactive label to do that. You replace it with a fluorophore. You can use a fluorophore label to do four-lane sequencing. That's all this claim requires. So there's nothing here, and I would simply say either Smith or Ruth enable doing that. And you can look at paragraph 41 of the DeViti report. That would be at appendix 11639. He was life's expert. He goes through in painstaking detail what's set forth in Sanger, and I think if the court looks at the difference using that linker arm chemistry to substitute the fluorophore for the radioactive label, you can see that that's exactly what's set forth and claimed in 62, and it was absolutely enabled. And 66, I'll just say as an aside, the dependencies don't add anything different than Sanger. They don't help them, and that's really not the point of the argument. But 66 basically tracks 62, with the exception that it would be the mixture as opposed to the method. And again, not limited to the DNA sequencing machine, which the patentees told everyone was the invention of the L96. So let me move, if I can, just to discuss the obviousness of double patenting for a moment. It wasn't, unless there are further questions. If we were to agree hypothetically with anticipation, then there's no need to reach there. That's correct, Your Honor. And then we've got the, even given the anticipation, if that's what we were to conclude, we've still got the obviousness case under claim 67, right? That is correct, Your Honor. Does an ODP reference need to be enabling, like we need it in regular prior art validity defense? Well, that's a good question. I would say that, you know, like this court's decisions in anticipation, the reference would be presumed to be enabled. In anticipation, the burden is on the patentee to show that it is not enabled. But here, I don't think the court would have to reach that question. If you look at your line of decisions under Lilly, well, Lilly summarizes them, broader than Kaplan, where you have a compound or a composition and what you're trying to do, which is what Wife tried to do here in claims 62 and 66, is patent around it with new, supposed new uses, new methods. We made, this court made a broader exception. You can look to the claim and you can look to the specification. And I think when you do, it's very clear that not only is it obvious, but it is also clearly enabled. Because if we look at, if we take a look at Claim 1 of the 800 patent, that sets forth in detail an example of linker arm chemistry to attach the fluorophore to the oligonucleotide. You can then go back to Column 5 of the 800 patent at Line 51 and you can see that the patent describes the use of that oligonucleotide as effective as a primer in sequencing analysis. To show that there's no dispute about it, if the court wanted to go farther, you can look to the DeVicke report at paragraphs 40 through 43. And I think it's just very clear that all that was done here was to modify Sanger with a fluorophore. And the 096, maybe that invention went farther with the DNA sequencing machine or single lane sequencing. But that's not what life claimed in 62, 66, and 67. And the last thing I would like to... I'm not going to use up all my time unless the court has further questions. The last thing I would like to point out is that in fact there was expert testimony on combining expert reports on Ruth and Suchia, not in the appendix, but at docket number DI356, Exhibit H, page 5 of 114. That issue was joined And our prior art reference is in the appendix at A16346 through 16347. Both the Smith 800 and Suchia abstract were on that. They were always a combination. So it is simply not correct to say that Judge Posner was at odds with Promega's experts. The fact of the matter is there was a wealth of art when they relied on the January 16, 1984 invention date. And there were multiple grounds upon which Judge Posner could have found. These were the clearest. Thank you. Returning to Ruth and Claim 67 and addressing Judge Post's question about the district court and the many different spectra. That's at A70. What he said is, this could be done using fluorophores with many different spectra, colors distinct enough from each other to be distinguishable by a computer, cite Ruth 882, column 3 at line 56. We go to Ruth at line, column 3, line 56. The first sentence says, the present invention is at A148. The present invention provides a substantially pure single-stranded oligonucleotide. So it's the opposite. What about columns 7 and 8? Let me just drop to that in one second while I'm here. At the bottom, at the last two lines, which is really what I think he intended to rely on, the reporter group can be capable of colometric, fluorescent, luminescent, or antibody or other ligand-mediated detection. Just saying there's different ways to do it, but it's always pure. The purity, I think, is so all over the patent that even if there's different fluoresceins and rhodamines disclosed in columns 7 and 8 and there may be, it's not teaching you to do that. It's teaching away from that. It's saying be pure. But the real point on that, which is sort of, if you go to A10246, and Judge Chen, I'm concerned a little bit that there may have been a little misunderstanding there. When I talked about the enablement, what wasn't enabled, you said, well, that really applies to claim 62, as I understood it. It applies to claim 67. How do we know? Because the expert says so. So if you're at A10246, because it's really, that to me is impossible for them to get over. Here's where they're criticizing the state of the art of fluorescence. They talk about weak data, but after the smeary data, do you see where it says that? It says, the 973 application, which is the patent, ensued, disclosed an oligonucleotide that could be, it does not appear that the 973 application, filed January 84, could actually be distinguishedly labeled with four different types of fluorophores, as required by claim 67. So even if you accept there's a fluorescein and a rhodamine, that's two. But who's even teaching you away by the purity? You just have, I mean, and if we had an expert supporting this, they certainly don't rely on it. Maybe it's in some docket number. But we have a judge relying on a computer finding spectral differences in something that's not supported by the reference. But you can't run a railroad, and we can't invalidate it. It's a very important invention that way, it seems to me. What I'd like to then focus on is the, with respect to the general obviousness argument, and I heard, it was just made flat out. If you had Sanger in 1977 that used radioactivity, just substitute fluorescence. You're done. Aw shucks. We're all rich. But if you go to the judge's own analysis, again, we're back to A70. Here he's quoting and crediting the testimony. There's a long and rich history of people who employed fluorescently labeled oligonucleotides. As I told you, labeling oligonucleotides fluorescently is old by all accounts. Their own expert said so. Their judge said so. Our expert said so. So if it was just so simple that you substituted fluorescence for radioactivity, it would have been done in 1977. Why did people not want to do it? Our expert actually put in an opinion that said bulky dyes would scare people. If you ever look at the size of an inorganic fluorescent dye relative to an oligonucleotide, it's this big floppy thing. The enzymatic qualities were so of such concern, people were concerned that it would disrupt it. Roof documents that. Final thought? Final thought is I don't see how we can say that it was so obvious to do this when the district judge who invalidated this patent and is obvious without expert support said it was a major breakthrough, gained widespread use, and it was a major DNA invention in his own analysis. Thank you very much. Thank both parties. The case is submitted.